# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| PRINTGUARD, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No.** |
| v. | ) | **07-40256-FDS** |
| | ) | |
| ANTI-MARKING SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## MEMORANDUM AND ORDER ON PRELIMINARY INJUNCTION

**SAYLOR, J.**

This is an action for patent infringement.  Plaintiff PrintGuard, Inc., alleges that defendant Anti-Marking Systems, Inc. ("AMSI"), infringed two patents owned by plaintiff:  U.S. Patent No. 6,811,863 (the "'863 patent") and U.S. Patent No. 7,270,873 (the "'873 patent").  The patents, in general terms, cover a foam-backed anti-marking covering for printing press transfer cylinders used in high-speed offset printing presses.

Plaintiff has moved for a preliminary injunction to prevent further sales of the accused products by the defendant.  Defendant has opposed that motion, and in the alternative has moved for expedited discovery pending a hearing on the preliminary injunction.  For the reasons set forth below, the Court will deny plaintiff's motion for preliminary injunction and deny as moot defendant's motion for expedited discovery.

I.      **Factual Background**

    A.      **Plaintiff's Invention**

High-speed offset printing presses are used to print a variety of high-quality printed materials, such as magazines, brochures, and catalogues.  In these presses, paper travels over various cylinders or drums, some of which apply ink and some of which carry inked paper from one printing station to another.  These latter cylinders are referred to as "transfer" cylinders.  The presses also have a final cylinder, known as a "delivery" cylinder, that delivers the printed material to a stack at the end of the process.  Anti-marking sheets are applied to transfer and delivery cylinders to prevent marking or smearing of the freshly printed paper as it travels through the press.

PrintGuard manufactures sheets of polyester anti-marking film with tiny glass beads embedded in the print-facing surface.  The majority of PrintGuard's business consists of manufacturing and selling transfer cylinder "jackets" specifically for use with the transfer cylinders of Heidelberg brand printing presses.  These "jackets" consist of anti-marking sheets with means (such as metal strips or elastic loops) for affixing the sheet to a transfer cylinder.  PrintGuard jackets have a glass bead film; an orange, ink-repellent coating on the glass beads; and a microcellular backing made of foam.  The foam backing fills in the low areas or voids due to wear or damage of the cylinder and likewise compresses at any high points on the transfer cylinder.  According to PrintGuard, historically press operators would "pack" sheets of paper between the jacket and the transfer cylinder to get a more uniform fit, but the foam-backed jackets eliminate the need for such packing.

According to PrintGuard, the foam-backed jacket is its most popular and highest-margin

2

product.  It has apparently accounted for approximately 60-80% of PrintGuard's annual revenue in each of the past three years.  PrintGuard sells the most commonly-used version of its jacket (for a Heidelberg model SM74 press) directly to printers for $264 and to dealers at a reduced price.

**B.     The '863 and '873 Patents**

The United States Patent and Trademark Office ("PTO") issued the '863 patent for "Anti-Marking Coverings for Printing Presses" on November 2, 2004.  This patent claims a "transfer element" comprised of a transfer cylinder and a "jacket" with two layers:  (1) an outer textured surface layer and (2) an inner microcellular layer.  ('863 patent at 2:66-67; 10:26-33; Figs. 2A-2B.)

"The outer layer is a durable textured surface [] that provides a raised pattern that supports the wet ink side of the sheet being printed, and prevents the marking or smearing of the wet ink on the sheet during transfer." (*Id.* at 10:14-17.)  In a preferred embodiment of the invention, the textured surface can be created by, among other things, embedding glass beads in the outer surface layer.  (*Id.* at 3:31-33; 10:62-65; Fig. 2B.)  The inner microcellular layer makes it easier to apply the jacket uniformly to a transfer cylinder so as to avoid creating ridges, bubbles, or creases in the anti-marking material, which can cause marks.  (*Id.* at 12:1-14; Fig. 4.)  Foam is the preferred microcellular layer.  (*Id.* at 6:66-7:5.)  Claim 1 of the '863 patent (the only independent claim) provides:

> 1.  A transfer element for to [*sic*] uniformly support a freshly printed sheet
> material as the freshly printed sheet material is conveyed from a first print station
> to a next station without marking, the transfer element comprising:
>
> a transfer cylinder having an outer face for transporting the freshly printed
> sheet material;

> an inner flexible microcellular material that is resilient to compressive
> forces provided on the outer face of the transfer cylinder; and
>
> an outer flexible substrate layer provided on the flexible microcellular
> material and having a textured surface protruding from a first side in a
> direction away from the flexible microcellular material for supporting the
> freshly printed sheet material.

(*Id.* at 14:20-33.)

The '873 patent was issued by the PTO on September 18, 2007; according to PrintGuard, it is "a continuation of the application that matured into the '863 patent." The '873 patent differs from the '863 patent primarily in that claim 1 more specifically claims the "transfer cylinder" component of the claimed "transfer element" by requiring that the radius of the transfer cylinder be uniform. ('873 patent at 14:24-28.)

## C.   <u>The Accused Product</u>

AMSI sells anti-marking materials under the Pearl-Tex brand.[1] Pearl-Tex anti-marking film, Type AF-21, has a glass bead surface with a green, ink-resistant coating. AMSI manufactures and sells transfer cylinder jackets with this film exclusively for use on Heidelberg presses. PrintGuard contends that since at least October 27, 2006, AMSI has sold in the United States infringing foam-backed transfer cylinder jackets specifically for use on a Heidelberg model SM74 press (the "Accused Product"). The Accused Product has allegedly been sold through at least one dealer as "Pearl-Tex Loop Jackets With Foam Backing" for $210, or $54 less than the price for PrintGuard foam-backed jackets. PrintGuard contends that the Accused Product is nearly identical to its foam-backed jackets, except that the Accused Product has a green surface

---

[1] Sivex Corporation, one of the original defendants in this case, was a reseller of anti-marking products for offset printing presses. Sivex is now AMSI, which carries on Sivex's business. *See* Memorandum in Support of Preliminary Injunction, Docket # 6, at n.7; Stipulation of Dismissal, Docket # 42.

color and is of allegedly inferior quality.  It contends that, just like a PrintGuard foam-backed

jacket, the Accused Product:  (1) is specifically sized and configured for use on the transfer

cylinders of a Heidelberg press; (2) has a foam backing that appears to be identical to the foam

backing used on PrintGuard's jackets; and (3) has a flexible plastic substrate layer with an outer

textured surface comprised of Pearl-Tex glass bead anti-marking film (Type AF-21), designed to

support the freshly printed sheet material.

> **D.**   **The '404 Patent**

On February 18, 1992, Shigeki Matsukawa and his former business partner, Ed

MacConnell, obtained U.S. Patent No. 5,088,404 (the "'404 patent") for an offset printing press

delivery apparatus that reduces the marring of wet ink through the use of cylinders covered with a

foam layer and glass bead film.  (*See* '404 patent at 5:47-6:15; 8:1-17; 10:21-26, 44-52.)  The

actual claim language does not specify any particular type of foam to be used as a backing for the

glass bead film.  One of the preferred embodiments described in the patent calls for reticulated

foam.  (*Id*. at 5:44-46.)[2]  There are also references throughout the patent disclosing simply

"foam," without specifying reticulated foam or any other particular type.  Claim 1 of the patent

claims "a delivery apparatus" that grips a sheet as the sheet "exits from said inking means."  (*Id.* at

10:1, 5.)  One preferred embodiment of the delivery apparatus includes a leading edge that is fixed

in a radially inward position with a wall that tapers from the leading edge to the central portion of

the wall to shorten the sheet path around the shaft.  (*Id.* at 8:54-58.)  The patent also discloses,

and claims, a delivery apparatus with a cylinder that has a leading edge wall that can be pivoted

---

[2] Reticulated foam is a soft, open-celled foam.  Microcellular foam is of high density, with very small cells.

into various positions, including into a position that apparently allows the cylinder to have a uniform radius.  (*Id.* at 5:20-30; 10:27-34; Fig. 1.)  "Inking means" are described as any area containing a blanket cylinder that applies ink to one side of a sheet of paper and an impression cylinder that provides a hard surface for the blanket cylinder to press the sheet against.  (*Id.* at 2:59-66.)  Each inking means applies one color of ink to one side of a sheet.  (*Id.* at 2:66-67.)  For multiple color printing, the sheets must go through plural inking means.  (*Id.* at 2:66-3:1.)

## II.     **Procedural Background**

On September 28, 2007, PrintGuard filed a complaint against Sivex Corporation, AMSI, and Shigeki Matsukawa alleging that defendants' conduct (1) infringed the '863 patent; (2) infringed the '873 patent; and (3) constituted unfair competition in violation of Massachusetts law.[3]

On October 26, 2007, plaintiff moved for a preliminary injunction.  Plaintiff requested that the Court enjoin defendants from further infringing the '863 and '873 patents, directly or indirectly, and that defendants be enjoined from supplying the products that plaintiff contends infringe its patents.

Defendants Sivex and AMSI opposed the motion on November 13, 2007, and requested in the alternative that the Court order expedited discovery.  Defendants Sivex and AMSI answered the complaint on November 19; defendant Shigeki Matsukawa filed a motion to dismiss the complaint for lack of jurisdiction.  After additional discovery, the parties filed supplemental memoranda, affidavits, and exhibits on December 12.

On December 13, 2007, the parties filed a stipulation of voluntary dismissal without

---

[3] Plaintiff amended its complaint on October 26, but did add or delete any counts.

prejudice as to all claims against Sivex and Matsukawa.  AMSI remains as the sole defendant in the matter.

## III.     Analysis

In determining whether a preliminary injunction should issue, the Court must consider (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm to the plaintiff if the injunction is denied; (3) the balance of relevant impositions, that is, the hardship to the non-moving party if enjoined as contrasted with the hardship to the moving party if no injunction issues; and (4) the effect, if any, of the Court's ruling on the public interest.  *See Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 11 (1st Cir. 2004) (citations and internal quotation omitted).  "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested."  *Hybritech, Inc., v. Abbott Labs.,* 849 F.2d 1446, 1451 (Fed. Cir. 1988).

### A.     Likelihood of Success on the Merits

The issues as to literal infringement in this matter are relatively straightforward. Defendant does not seriously contest that it is manufacturing and distributing products that are covered by claims in plaintiff's patents, although it does argue that plaintiff has not adduced sufficient evidence of direct infringement.  The principal issue, instead, concerns the validity of the '863 and '873 patents.  Defendant contends that the patents are invalid due to (1) anticipation by prior product sales, (2) anticipation by the '404 patent, and (3) obviousness.  Defendant further contends that the patents are unenforceable because of plaintiff's inequitable conduct.

According to the Federal Circuit, in order to demonstrate a likelihood of success on the

7

merits, the moving party must show that, "in light of the presumptions and burdens that will inhere at trial on the merits," (1) the moving party will likely prove that the non-moving party infringes the patent, and (2) the moving party's infringement claim will likely withstand the non-moving party's challenges to the validity and enforceability of the patent. *Genentech, Inc., v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed Cir. 1997); *accord Amazon.com, Inc., v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). If, however, the non-moving party "raises a substantial question concerning validity, enforceability, or infringement, (*i.e.*, asserts a defense that [the patentee] cannot show lacks substantial merit) the preliminary injunction should not issue." *Genentech,* 108 F.3d at 1364 (citation and internal quotation omitted).[4]

An apparent tension exists between the "likelihood of success" requirement and the "substantial question" language of *Genentech*. Under *Genentech*, a preliminary injunction should not issue if the defendant raises a "substantial question" concerning the validity of the patent—even if the Court were to conclude that the moving party is more likely to succeed on that issue. Consider, for example, a defendant who raises a validity defense that has a 49% likelihood of success on the merits; such a defense is plainly "substantial," yet it is not "likely to

---

[4] The Federal Circuit subsequently described the relevant standard as follows:

In resisting a preliminary injunction . . . one need not make out a case of actual invalidity. Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself.

When moving for the extraordinary relief of a preliminary injunction, a patentee need not establish the validity of a patent beyond question. The patentee must, however, present a clear case supporting the validity of the patent in suit.

*Amazon.com*, 239 F.3d at 1359 (citations omitted).

succeed."  Under *Genentech*, preliminary injunctive relief should not issue in such a case, even though the plaintiff is likely to succeed on the merits.

Nine years after *Genentech*, the Supreme Court ruled that traditional equitable principles, including the traditional four-factor test, govern the award of injunctive relief in patent cases. *eBay, Inc., v. MercExchange, LLC*, ___U.S. ___,126 S. Ct. 1837, 1841  (2006) ("We hold only that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.").  That decision would appear to require that courts apply the traditional "likelihood of success" factor in all cases, including those in which the non-moving party raises a "substantial question" of validity.

Nonetheless, the Federal Circuit soon thereafter reaffirmed the principle of *Genentech*. *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 & n.2 (Fed. Cir. 2006).  In describing the analytical framework for the likelihood of success analysis, the Federal Circuit again stated that "if the defendant raises a substantial question concerning validity, i.e.[,] an invalidity defense that the patentee cannot prove lacks substantial merit then the patentee has not established a likelihood of success on the merits."  *Id.* at 1335 (citations and internal quotation omitted).  Judge Newman, writing in dissent, argued that the *Genentech* standard was "incorrect in law and in procedure," apparently on the grounds that *eBay* required the application of traditional equitable principles.  *Id.* at 1350.

Whatever analytical tension may exist between *eBay* and *Genentech*, this Court is not free to disregard binding circuit precedent.  *See, e.g., Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir.1994); *Hybritech*, 849 F.2d at 1451 n.12.  Accordingly, the Court will apply the

*Genentech* standard:  if defendant raises a "substantial question" as to the validity of the relevant patents, preliminary injunctive relief will be denied.  A "substantial question" will be raised if the defendant asserts an invalidity defense that plaintiff "cannot show lacks substantial merit." *Genentech*, 108 F.3d at 1364.

### 1.    Infringement

As noted, in order to satisfy the likelihood of success prong of the preliminary injunction test, plaintiff must first demonstrate that defendant infringes either or both of the patents-at-issue. In order to do so, plaintiff must show a reasonable likelihood of proving that at least one claim of either of the patents-at-issue is infringed.  *Hybritech,* 849 F.2d at 1451.  Proving patent infringement is a two-step process.  The Court must first construe the asserted patent claims to determine their meaning and scope, then it must compare the properly construed claims with the accused device.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).

### a.    Claim Construction

At the preliminary injunction stage, the Court must make an initial claim construction subject to revision as the case develops.  The starting point for claim construction is the words of the claims.  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005).  Claims are generally given their ordinary and customary meaning, as understood by one of ordinary skill in the art at the time of the invention.  *Id.* at 1312-13; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent.  *Phillips*, 415 F.3d at 1321.  Where the ordinary meaning of a claim term is "readily apparent," claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

Plaintiff contends that claim 1 of the '863 patent and claim 1 of the '873 patent each contain language that does not require special construction. Specifically, plaintiff contends that the ordinary meaning of the terms "transfer cylinder," "inner flexible microcellular material," "outer flexible substrate layer," and "textured surface" is reflected in the definitions of these terms provided in the '863 patent specification. ('863 patent at 6:1, 13-18, 61-65; 7:59-67.) Likewise, the nearly identical terms in claim 1 of the '873 patent are defined in that patent's specifications. ('873 patent at 6:10, 23-28; 7:3-7, 63-67; 8:1-3.) Defendant does not challenge plaintiff's claim construction. Accordingly, the Court adopts the ordinary meaning of those terms as reflected in the '863 patent specifications.[5]

**b.     Defendant's Alleged Infringement**

---

[5] The specifications for the '863 patent define the terms as follows:

Transfer cylinder: Cylinders within a printing machine that facilitate the transfer or transport of a freshly printed sheet from one station to the next. Transfer cylinders are commonly referred to as delivery cylinders, transfer drums, delivery wheels, skeleton/tracking/guide wheels, transfer rollers, delivery rollers and any other movable apparatus that is capable of transferring a freshly printing substrate in a printing press.

Microcellular layer: A layer that is made up of one or more materials containing minute gaseous areas that allow the layer to compress when placed under pressure/weight and prove the layer resiliency upon release of this pressure/weight.

Flexible substrate: Any dimensionally stable film such as polyethylene terephthalate (PET), polyethylene naphthalate (PEN), polycarbonate, polyolefins, styrene, nylon, polyether ester ketone (PEEK), polyester sulfone (PES), polyvinyl chloride (PVC), biaxially oriented polypropylene (BOPP); metal foils such as aluminum, copper, nickel, tin, steel, coated steel, stainless steel, brass; paper, both natural and synthetic; and fabric, both woven and non-woven.

Textured surface: The non-smooth surface that is on the exposed side of the anti-marking material and which comes in contact with the freshly printed sheet. The textured surface may be embossed with any pattern that provides raised ridges and valleys such that the high points adequately support the freshly printed sheet.

Plaintiff contends that based on the plain meaning and defined terms of the patents-in-suit, the Accused Product meets every limitation of the "transfer element" taught in claim 1 of the '863 and '873 patents.  Because the Accused Product has each of these features, plaintiff contends that defendant is liable for (1) contributory infringement, (2) inducing infringement, and (3) direct infringement.

First, under 35 U.S.C. § 271(c), the seller of a component part of a patented invention is liable as a contributory infringer if he knows that the component (1) constitutes a material part of the invention; (2) is especially made or especially adapted for use in an infringement of such patent; and (3) is not a staple article or commodity of commerce suitable for substantial noninfringing use.  Plaintiff contends defendant is liable for contributory infringement because any printing press operator who uses the Accused Product as intended—by applying it to a transfer cylinder—necessarily creates the claimed "transfer element."

Second, plaintiff contends that defendant is liable for actively inducing infringement under § 271(b) because defendant explicitly intends the Accused Product to be combined with a transfer cylinder of a Heidelberg press, thereby creating an infringing "transfer element."  *See Snuba Int'l, Inc., v. Dolphin World, Inc.,* No. 99-1357, 2000 WL 961363, at *7 (Fed. Cir. 2000); *Cohesive Techs., Inc., v. Waters Corp.*, Nos. 98-12308, 99-11528, 01-12307, 2007 WL 2746805, at *24 (D. Mass. Aug. 31, 2007).

Finally, plaintiff contends that to the extent that defendant applies the Accused Product to transfer cylinders—which, according to plaintiff, necessarily occurred in the testing process and likely occurred during the sales process—it has assembled the claimed "transfer element" and have thereby directly infringed the patents-in-suit in violation of § 271(a).

12

Defendant does not contest that it has made sales of the Accused Product.  Defendant contends, however, that plaintiff fails to offer any actual evidence of direct infringement and fails to identify any direct infringer in its motion.  Without direct infringement, by defendant or another party, defendant contends it cannot be found liable for indirect infringement.

Defendant correctly states that, as a matter of law, there can be no liability for indirect infringement without a direct infringer.  *E.g., Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1326 (Fed. Cir. 2004).  Defendant, however, does not dispute that when a printing press operator installs the Accused Product on a transfer cylinder, the operator creates the "transfer element" of claim 1 of the patents-in-suit; thereby directly infringing the patents. Further, defendant does not dispute that it has sold, and currently sells, microcellular foam-backed jackets intended to be attached to printing press transfer cylinders.

Accordingly, the Court concludes that plaintiff has a reasonable likelihood of proving that defendant has contributorily infringed and has actively induced printing press operators to infringe at least one claim of the '863 and '873 patents.

### 2.    <u>Validity and Enforcement</u>

As noted, the principal issue presented is whether the evidence proffered by defendant is sufficient to raise a "substantial question" as to validity, thus precluding preliminary injunctive relief.  Defendant contends that the '863 and '873 patents are invalid and unenforceable on four grounds:  (1) anticipation by prior product sales; (2) anticipation by the '404 patent; (3) obviousness; and (4) plaintiff's allegedly inequitable conduct.

13

a.      **Anticipation by Prior Sales**

Defendant first contends that both the '863 and '873 patents are invalid as anticipated by prior sales.  A patent may be invalidated by anticipation under 35 U.S.C. § 102(b) if there was "a definite sale or offer to sell more than one year before the application for the patent and that the product sold or offered for sale anticipated the claimed invention or rendered it obvious."  *3M v. Chemque, Inc.,* 303 F.3d 1294, 1301 (Fed. Cir. 2002); *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1122 n.5 (Fed. Cir. 1996).

The earlier of the two patents-in-suit, the '863 patent, had an application date of July 2002 with a priority date of July 2001.  Defendant contends that under § 102(b), the asserted claims of the '863 and '873 patents are invalid as anticipated because the claimed invention (a foam-backed jacket for transfer cylinders) was sold by defendant in 1998, more than one year before plaintiff's patent application was filed.  Specifically, defendant contends that Sivex (its predecessor) sold foam-backed jackets for transfer cylinders in approximately 1995, and made at least a single sale of such a product in 1998.  In support of that claim, defendant has submitted (1) a product brochure from 1995, (2) an invoice from 1998, and (3) an engineering drawing, apparently from 1998.

 The 1995 brochure indicates that Sivex sold anti-marking products with a "polyester base film" with elastic loops that "allow easy mounting and various amounts of under-packing thicknesses."  It is unclear whether the product had foam backing; the brochure appears to suggest the opposite, as the purpose of the foam in the claimed invention is to eliminate the need for "under-packing."

The 1998 invoice concerns a product described as:  "Loop Jacket EZ72, 25-1/8"x29,"

Heidelberg 72, w/Foam Backing."  Defendant did not, however, provide any further description

of that product, or any brochure, photograph, or other depiction.[6]  It is unclear whether this is the

same product depicted in the 1995 brochure; while the brochure depicts an "EZ" model anti-

marking "Loop Jacket," as noted, the brochure does not indicate whether the product was

available with foam backing.  The invoice itself contains no additional relevant information.

     The engineering drawing, which is from Sivex's files, appears to show a foam-backed

jacket for a transfer cylinder, without indicating what type of foam is involved.

     According to plaintiff, no additional information as to prior sales is available, or likely to

become available:  neither of the entities referenced on the invoice is in existence today, no

successor possesses any relevant documents, no representative of defendant has any personal

knowledge, and the relevant Sivex employee who handled the sale is deceased.

     The evidence concerning prior sales is ambiguous and incomplete, and it may well prove

to be true that the evidence may never be supplemented.  *See Baychar, Inc., v. Burton Corp.,* No.

04-144-B-C, 2006 WL 2162314, at *5 (D. Me. July 28, 2006) (finding declarant's assertion that

product identified in an invoice was identical to the specification for an alleged anticipatory

product insufficient to establish "on sale" bar for summary judgment purposes).  Nonetheless,

under the circumstances, defendant has raised a "substantial question" as to whether the patents-

in-suit are invalid as anticipated by prior sales.  As noted, "[v]alidity challenges during preliminary

injunction proceedings can be successful, that is, they may raise substantial questions of invalidity,

on evidence that would not suffice a judgment of invalidity at trial."  *Abbott Labs.*, 452 F.3d at

---

[6] According to an affidavit by Matsukawa, "based on the size of the jackets it is clear that they are for use on transfer cylinders."

1335 (citation and internal quotation omitted).  Accordingly, a preliminary injunction should not

issue, as the existence of a "substantial question" of validity precludes a finding of likelihood of

success on the merits.

**b.**      <u>**Anticipation by Patent**</u>

Defendant next contends that the patents-in-suit are also anticipated by the '404 patent.  A

patent is invalid for anticipation where "the invention was known or used by others in this

country, or patented or described in a printed publication in this or a foreign country, before the

invention thereof by the applicant for patent." 35 U.S.C. § 102(a).  The question is not "the

precise scope of the claims in [the prior patent], but what is disclosed in the specification and

made known to the world." *Minerals Separation N. Am. Corp. v. Magma Copper Co.,* 280 U.S.

400, 402 (1930).  For prior art to be anticipatory, however, each and every element of the claim-

at-issue as properly construed must be found either expressly or inherently in a single prior art

reference. *Rapoport v. Dement*, 254 F.3d 1053, 1057 (Fed. Cir. 2001).

Defendant contends that every limitation of the patents-in-suit is found in the '404 patent,

and that therefore the later patents are invalid for anticipation.  Plaintiff, however, notes that the

'404 patent was, in fact, actually considered by the PTO before the examiner issued the '873

patent.  Defendant's burden of proving invalidity by anticipation is especially difficult when the

allegedly anticipatory prior art was before the PTO examiner during prosecution of the patent

application. *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir.

1990); *Candela Laser Corp. v. Cynosure, Inc.*, 862 F. Supp. 632, 639 (D. Mass. 1994), *aff'd*, 59

F.3d 181 (Fed. Cir. 1995).  This heightened burden is grounded in the deference due to an expert

agency that presumptively did its job. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725

16

F.2d 1350, 1359 (Fed. Cir. 1984).

Plaintiff further contends that even were there a reason to go behind the PTO decision, defendant's arguments about the '404 patent lack merit.  Specifically, plaintiff contends that the '404 patent neither (1) covers the transfer cylinders disclosed in the '863 and '873 patents nor (2) contains the uniform radius limitation of claim 1 of the '873 patent.

As to the first issue, defendant contends that the '404 patent claims a delivery apparatus that grips a printed sheet as it "exits from said inking means."  According to defendant, the printing presses in which the devices are used have multiple "inking means," and therefore a "delivery apparatus" necessarily includes the transfer cylinders that move sheets from one "inking means" to the next.  Plaintiff contends in response that the terms "delivery" and "transfer" have well-established—and distinct—meanings, and indeed the '404 patent itself makes that very distinction.

As to the "uniform radius" issue, plaintiff contends that each claim of the '404 patent claims a tapered cylinder, and that the preferred embodiment contains the following language:

> Referencing FIGS. 3 and 4, a delivery apparatus 151 in accordance with another embodiment will be described.  The delivery apparatus 151 has at least one leading edge 173 that is fixed in a radially inward position.  The wall 165 tapers from the leading edge to the central portion of the wall to shorten the sheet path around the shaft 153.

('404 patent at 8:52-58).  Furthermore, plaintiff notes, the patent examiner in this case considered the '404 patent and made the following statement of reasons for allowance:

> [The '404 patent] requires a transfer cylinder having a portion tapering from the leading edge to the central portion to shorten the sheet path around the shaft for reducing marring of wet ink against a delivery apparatus.  One skilled in the art would not be motivated to modify the transfer cylinder having a uniform radius extending from a first longitudinal edge to a second longitudinal edge because to

17

do so would defeat the objective of [the '404 patent].

\*                    \*                    \*

Note that, none of the cited art, alone or in combination, teaches or suggests a claimed transfer element. Accordingly, the instant claims are deemed allowable.

Defendant, however, disputes that conclusion, and argues that even if the '404 patent only *claims* a tapered cylinder, the specification *discloses* a cylinder with a uniform radius, as Figures 3 and 4 depict a cylinder of uniform radius.

The Court concludes that defendant has not raised a "substantial question" as to the validity of the patent by reason of anticipation under § 102(a).  First, the '404 patent was actually considered by the examiner prior to the issuance of the '873 patent.  Second, the use of the phrase "delivery apparatus," in context, does not appear to include a transfer cylinder.  The word "delivery" appears to have a specific meaning with regard to a printing press that is distinct from the word "transfer," and the use of the phrase "inking means" does not alter that distinction.  Third, while there is some ambiguity as to whether the specification discloses a cylinder with a uniform radius—perhaps because the tapering is too small to be reflected in the diagram—a fair reading of the '404 patent strongly suggests that it discloses only a tapered cylinder.  Accordingly, as to this issue, the evidence does not support the granting of a preliminary injunction.


c.      **Obviousness**

Defendant next contends that even if the patents-in-suit are not anticipated, they are nonetheless invalid because plaintiff's claimed inventive step of using a foam-backed anti-marking jacket on a transfer cylinder instead of a delivery cylinder was obvious.  A patent is invalidated

18

under 35 U.S.C. § 103 by obviousness if the differences between the claimed invention and the

device used would have been obvious to one of ordinary skill in the art. *Lough*, 86 F.3d at 1122

n.5.      As the Supreme Court has noted, "[i]f a person of ordinary skill can implement a

predictable variation, § 103 likely bars its patentability.  For the same reason, if a technique has

been used to improve one device, and a person of ordinary skill in the art would recognize that it

would improve similar devices in the same way, using the technique is obvious unless its actual

application is beyond his or her skill." *KSR Int'l Co. v. Teleflex, Inc.*, ___ U.S. ___, 127 S. Ct.

1727, 1740 (2007).  The Court went on to state:

> When there is a design need or market pressure to solve a problem and there are a
> finite number of identified, predictable solutions, a person of ordinary skill has
> good reason to pursue the known options within his or her technical grasp.  If this
> leads to the anticipated success, it is likely the product not of innovation but of
> ordinary skill and common sense.  In that instance the fact that a combination was
> obvious to try might show that it was obvious under § 103.

*Id.* at 1742.  The underlying factual inquiries in an obviousness analysis include (1) the scope and

content of the prior art, (2) the level of ordinary skill in the prior art, (3) the differences between

the claimed invention and the prior art, and (4) objective evidence of non-obviousness. *Daiichi*

*Sankyo Co., Ltd., v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (citations and internal

quotation omitted).

          Defendant contends that even assuming that the '404 patent discloses only glass-bead,

foam-backed jackets for delivery cylinders, it would be obvious to one skilled in the art to use the

same anti-smearing jackets on transfer cylinders—substantially identical cylinders with

substantially identical issues of ink smearing.  Defendant further contends that assuming plaintiff's

invention of moving a known anti-smearing device from one cylinder to the next was motivated

19

by the market's desire to prevent smearing by all transfer cylinders, such an invention was "blatantly obvious."

Plaintiff contends in response that the examiner—someone who is presumptively skilled in the art and familiar with what is obvious in the art—already considered the '404 patent and determined that it did not render the claims that matured into the '873 patent obvious. Plaintiff further argues that defendant offers no analysis of the gap between the prior art (the '404 patent, which applies a foam material to a tapered delivery cylinder) and the '863 and '873 patent claims (which apply a microcellular foam to a uniform radius transfer cylinder), nor any explanation of why and how a person of ordinary skill in the art would close that gap. *KSR Int'l Co.*, 127 S. Ct. at 1734. Finally, plaintiff contends that defendant fails to identify the ordinary level of skill in the art, a fatal deficiency to an obviousness defense. *See, e.g., Customer Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

As to the latter point, it is well-established that in certain situations, such as with relatively simple and understandable technology, a specific finding on the level of ordinary skill in the art is unnecessary because the prior art itself is representative of the relevant level of ordinary skill. *Chore-Time Equip., Inc., v. Cumberland Corp.*, 713 F.2d 774, 779 & n.2 (Fed. Cir.1983). The Court finds that the '863 and '873 patents fall on the simple end of the complexity spectrum and that the prior art itself reflects the relevant level of ordinary skill. Accordingly, the Court finds it unnecessary to make a specific finding of fact regarding the level of ordinary skill in the art.

Furthermore, under the circumstances, the Court concludes that defendant has raised a "substantial question" as to the validity of the patent due to obviousness. Particularly given the relative simplicity of the claimed inventions, there is a substantial issue as to whether it would

20

have been obvious for a person of ordinary skill in the art to have applied a foam-backed jacket to a transfer cylinder of uniform radius.  Again, a preliminary injunction should not issue, as such a "substantial question" precludes a finding of likelihood of success on the merits.

**d.    <u>Unenforceability Due to Inequitable Conduct</u>**

Finally, defendant contends that the '863 and '873 patents are unenforceable because of plaintiff's inequitable conduct.  A patent may be rendered unenforceable for inequitable conduct if there is clear and convincing proof of (1) prior art or information that is material; (2) knowledge chargeable to the applicant of that prior art or information *and* of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.  *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415-16 (Fed. Cir. 1987).  Intent to mislead "means that the inventor intended to deceive or mislead the examiner into granting the patent."  *Therma-Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 995 (Fed. Cir. 1995).  Inequitable conduct as to a single claim will also render unenforceable all subsequent claims which spring from the same or a related application.  *Fox Indus., Inc., v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803-04 (Fed. Cir. 1990).  Thus, inequitable conduct as to the '863 patent renders both the '863 and '873 patents unenforceable because the '873 patent is a continuation of the '863 patent.

Defendant alleges that plaintiff failed to disclose the '404 patent to the PTO examiner, and that there is no indication in the prosecution history that plaintiff submitted samples of defendant's products, including brochures and price lists, that plaintiff had in its possession as of the late 1990's.

As to the first issue, plaintiff responds that the patent examiner in fact considered the '404 patent before issuing the '873 patent.  Plaintiff also contends that defendant has offered no

21

evidence that the inventors of the '863 and '873 patents knew about the '404 patent before filing either of the patent applications.  As to the unidentified products that the defendant claims it has sold "for years," according to plaintiff, defendant never provided it with any such materials. While defendant did provide materials, including product samples, to PrintGuard in 2000, defendant apparently never sent PrintGuard foam-backed anti-marking materials or jackets of any kind.

"When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner" and there can thus be no inequitable conduct.  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1185 (Fed. Cir. 1995) (citations and internal quotations omitted).  Here, the '404 patent was before the examiner, so the failure of the inventors of the '863 and '873 patents to cite that reference did not constitute inequitable conduct.  Because there is no evidence in the record to support defendant's allegation that plaintiff withheld additional materials from the examiner, defendant has not raised a substantial question as to the enforceability of the patents-in-suit based on inequitable conduct.

\*                    \*                    \*

As noted above, the issue presented is whether defendant has raised a "substantial question" as to the validity of the patents at issue.  Under the law of the Federal Circuit, as articulated in *Genentech* and *Abbott Laboratories*, if defendant has raised such a "substantial question," preliminary injunctive relief should be denied.  That standard is binding upon this Court.

The questions raised by defendant as to the validity of the patents noted above may or may not be meritorious, but they clearly fall under the heading of  "substantial."  A factfinder could, if

he or she chose to credit all of defendant's evidence, potentially find the patents-in-suit invalid as anticipated and/or obvious.  Accordingly, under the standard set forth by the Federal Circuit, PrintGuard cannot establish a likelihood of success on the merits.  Under the circumstances, it is not necessary for the Court to consider the remaining preliminary injunction factors.  *Reebok,* 32 F.3d at 1556 ("[A] district court may properly deny a motion for preliminary injunction simply based on the movant's failure to establish a reasonable likelihood of success on the merits . . . .").

## IV.    <u>Conclusion</u>

For the foregoing reasons, the motion of plaintiff PrintGuard, Inc., for a preliminary injunction is DENIED.  The motion of defendant Anti-Marking Systems, Inc., for expedited discovery is DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: January 16, 2008